UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

MERRILL LYNCH, PIERCE FENNER & SMITH
INCORPORATED,

                   Interpleader Plaintiff,

                   v.

SEYMOUR SOHMER, and LIBA TARGOWNIK,
individually and as nominated executor of the estate
of Sally Sohmer,

                   Interpleader Defendants.

-------------------------------------------------------------

**MEMORANDUM & ORDER**
16-CV-1856 (MKB)

MARGO K. BRODIE, United States District Judge:

Interpleader Plaintiff Merrill Lynch, Pierce Fenner & Smith Incorporated ("Merrill

Lynch") filed the above-captioned action on April 15, 2016 pursuant to 28 U.S.C. § 1335, to

determine proper ownership of, distribution of, and Defendants' entitlement to funds in a joint

investment account held by Merrill Lynch.  (Compl., Docket Entry No. 1.)  Currently before the

Court are the parties' cross-motions for summary judgment pursuant to Rule 56 of the Federal

Rules of Civil Procedure.[1]  Because there are disputed issues of material fact as explained below,

the Court denies the parties' motions for summary judgment.

    **I.**    **Background**

        **a.**    **Factual background**

    The facts are undisputed, unless otherwise noted.

---

[1] (Sohmer Mot. for Summ. J. ("Sohmer Mot."), Docket Entry No. 89; Sohmer Mem. of
Law in Supp. of Sohmer Mot. ("Sohmer Mem."), Docket Entry No. 89-61; Targownik Cross-
Mot. for Summ. J. ("Targownik Cross-Mot."), Docket Entry No. 91; Targownik Mem. of Law in
Opp'n to Sohmer Mot. and in Supp. of Targownik Cross-Mot. for Summ. J. ("Targownik
Mem."), Docket Entry No. 91-1.)

### i. The parties

Seymour Sohmer ("Sohmer") resides in Alexander, Virginia and is employed as a

botanist and researcher in Arizona. (Sohmer Rule 56.1 Statement of Undisputed Material Facts

("Sohmer 56.1") ¶ 1, Docket Entry No. 89-60.) Liba Targownik is approximately sixty-two

years old, unemployed, has been disabled since 2013, and resides with her son in Brooklyn, New

York. (Sohmer 56.1 ¶ 2; Targownik Resp. to Sohmer 56.1 ("Targownik Resp. 56.1") ¶ 2,

Docket Entry No. 91-32.) Sally Sohmer ("Sally") is Sohmer's maternal half-sister who passed

away on January 4, 2016 at the age of eighty-nine. (Sohmer 56.1 ¶ 3; Targownik Resp. 56.1 ¶

3.) Sally never married and did not have any children. (Sohmer 56.1 ¶ 4; Targownik Resp. 56.1

¶ 4.) Sohmer maintains that he had a "warm and loving relationship" with Sally and was

"constantly corresponding," with her, but Targownik asserts that Sally and Sohmer only had a

"long distance or friendly relationship." (Sohmer 56.1 ¶ 5; Targownik Resp. 56.1 ¶ 5.)

### ii. Creation of a joint account held by Merrill Lynch

Sally and Sohmer owned various properties together, including a joint account with right

of survivorship established in July of 2004, held by Merrill Lynch (the "Joint Account").

(Sohmer 56.1 ¶¶ 6–7; Targownik Resp. 56.1 ¶¶ 6–7.) Prior to the Joint Account, the account was

held solely under Sally's name.[2] The Joint Account consisted of securities which had been

Sally's alone prior to the Joint Account and Sally was the sole depositor of the account funds.

(Targownik 56.1 ¶¶ 102, 105; Sohmer Resp. 56.1 ¶¶ 102, 105; Power of Att'y, annexed to

Sohmer Decl. as Ex. 2, Docket Entry No. 89-3; Limited Power of Att'y, annexed to Sohmer

---

[2] (Targownik Rule 56.1 Statement of Undisputed Material Facts ("Targownik 56.1") ¶ 97, Docket Entry No. 91-32; Sohmer Resp. to Targownik 56.1 ("Sohmer Resp. 56.1") ¶ 97, Docket Entry No. 89-68; Roja Reuven Gigi Dep. ("Gigi Dep.") 90–91, annexed to Calcagni Decl. as Ex. 8, Docket Entry No. 91-8.)

Decl. as Ex. 3, Docket Entry No. 89-4.) The parties do not dispute that Sally instructed Merrill Lynch to establish the Joint Account but Targownik maintains that it was not Sally's idea to change the account into a Joint Account, rather, Merrill Lynch's employee, Judah Munk, recommended to Sally that she change the account.[3] (Sohmer 56.1 ¶¶ 6–7; Targownik Resp. 56.1 ¶¶ 6–7.)

To establish the Joint Account, Sally and Sohmer signed Merrill Lynch Joint Account Customer Agreement forms on July 24 and July 28, 2004, respectively, stating that the Joint Account is a joint account with right of survivorship. (Sohmer 56.1 ¶ 8; Targownik Resp. 56.1 ¶ 8.) Sohmer testified during his deposition that the purpose of adding him to the account was "to help [Sally] in case she became incapacitated" and to "avoid probate as well." (Sohmer Dep. 33:17–24.) Sohmer also testified that Sally wanted to make sure that "all of the funds" in the Joint Account went to him when she died. (*Id.* at 34:15–17.) However, Judah Munk testified at his deposition that Sally did not "anticipate[] that anything was going to happen [with the Joint Account] and therefore, she had full control of [the Joint Account]."[4] (Deposition of Judah Munk ("Munk Dep.") 178:20–24, annexed to Sohmer Decl. as Ex. 8, Docket Entry No. 89-9.)

---

[3] In 2004, Munk was Sally's broker and an employee of Merrill Lynch. (Munk Dep. 251:23, 252:16.) He testified at his deposition that he "suggested to [Sally] to put someone else's name on the account so it wouldn't have to go through probate . . . ." (Munk Dep. 45:15–24.) He further testified that he and Sally "wanted to make [the Joint Account] a joint account with right of survivorship" so that the funds would "avoid probate and to make life easier for whoever is going to inherit." (*Id.* at 181:13–17.)

[4] According to Sohmer, in addition to the Joint Account, he and Sally jointly owned a checking account at Apple Bank, New York, a safety deposit box at Apple Bank, and a joint investment in a limited partnership company called Williams Partners L.P. (Sohmer 56.1 ¶ 15(a)–(c).) Targownik contends that the joint checking account at Apple Bank is "another convenience account," that Sohmer is only deputy and agent and not an owner of the safe deposit box, and that the investment in Williams Partners L.P. was a business venture. (Targownik Resp. 56.1 ¶ 15(a)–(c).)

### iii. Transactions subsequent to the creation of the Joint Account

Sohmer does not recall making any deposits into the Joint Account. (Sohmer Dep. 174:17–23.) Further, Targownik contends that Sohmer did not issue a check from the Joint Account, (Targownik 56.1 ¶ 109), but Sohmer states that "on or about July 28, 2014, after a discussion [with Sally] in which Sally insisted that [he] use $210,000 from their Joint Account . . . Sohmer, who had check writing authority and was able to write (or 'issue') such check demurred, so Sally gave [him] a check to pay off [his] and his wife's loan," (Sohmer Resp. 56.1 ¶ 109; Check dated July 28, 2014, annexed to Sohmer Reply Decl. as Ex. 63, Docket Entry No. 89-66.)

After establishing the Joint Account, Sohmer contends that he received monthly Joint Account statements from Merrill Lynch, yearly Internal Revenue Service ("IRS") Form 1099s on the Joint Account, and possessed blank Joint Account checks allowing him to make withdrawals.[5] (Sohmer 56.1 ¶ 9(a)–(c).) In addition, although Sohmer contends that he "could make out any checks and make payments from the Joint Account," (Sohmer 56.1 ¶ 10), Targownik contends that the "testimony . . . states that Merrill Lynch would not honor a check issued by [Sohmer], as Power of Attorney, to his own order from the Joint Account," (Targownik Resp. 56.1 ¶ 10). Sohmer believes Sally paid the taxes because of her lower tax rate. (Targownik 56.1 ¶ 112; Sohmer Resp. 56.1 ¶ 112.)

On June 14, 2015, Sally and Sohmer executed a Merrill Lynch Client Relationship

---

[5] Targownik disputes that Sohmer received monthly statements and maintains that the statements were only sent to Sally. (Targownik Resp. 56.1 ¶ 9(a).) Targownik also contends that Sally paid all taxes on the Joint Account and was in sole possession of the Joint Account checkbook. (Targownik Resp. 56.1 ¶ 9(b)–(c).) Munk did not know whether Sohmer received monthly statements. (Munk Dep. 47:21–25, annexed to Sohmer Decl. as Ex. 8, Docket Entry No. 89-9.)

Agreement Form for Individual, Joint, or Retirement Accounts. (Merrill Lynch Client Relationship Agreement Form for Individual, Joint, or Retirement Accounts, annexed to Calcagni Decl. as Ex. 18, Docket Entry No. 92-4; Sohmer 56.1 ¶ 16.) Targownik states that "this agreement was only executed to give effect to an automatic account transfer form executed at or near the same time." (Targownik Resp. 56.1 ¶ 16.) Roei R. Gigi, Senior Resident Director at Merrill Lynch, testified during her deposition that she assumed the Client Relationship Agreement was executed because Merrill Lynch "required [Sally and Sohmer] to update the paperwork." (Gigi Dep. 254:7–21.)

### iv. Healthcare proxy and power of attorney

On May 3, 1994, Sally designated Sohmer as her healthcare proxy and Sohmer's wife, Sara Sohmer, as her substitute healthcare proxy. (Sohmer 56.1 ¶ 11; Targownik Resp. 56.1 ¶ 11; Health Care Proxy, annexed to Sohmer Decl. as Ex. 4, Docket Entry No. 89-5.) On November 4, 2004, Sally executed a Merrill Lynch Power of Attorney form, prepared by her then-attorney, Ernest Bial, naming Sohmer as her agent and attorney-in-fact and giving Sohmer the power and authority to act on Sally's behalf with regard to accounts at Merrill Lynch. (Sohmer 56.1 ¶ 12–13; Targownik Resp. 56.1 ¶¶ 12–13; Durable Power of Att'y, annexed to Sohmer Decl. as Ex. 7, Docket Entry No. 89-8.) Munk testified that Sally wanted the Joint Account to be her alternative to probate. (Sohmer 56.1 ¶ 14; Targownik Resp. 56.1 ¶ 14; Munk Dep. 45:19–24, annexed to Sohmer Decl. as Ex. 8, Docket Entry No. 89-9.)

### v. Sally's 1994 and 2007 wills

On November 4, 1994, Sally executed a will which made specific bequests to her nieces and nephews, left the remainder of her estate to Sohmer, and designated Sohmer as her executor (the "1994 Will"). (Sohmer 56.1 ¶ 17; Targownik Resp. 56.1 ¶ 17.) On April 28, 2007, Sally

executed a second will, making specific bequests to family members and leaving the remainder of her estate to Sohmer, who she again designated as her executor (the "2007 Will"). (Sohmer 56.1 ¶ 18; Targownik Resp. 56.1 ¶ 18.) The 2007 Will provided for a contingent plan for contribution to education expenses for Sally's named grandnephews. (Targownik 56.1 ¶ 116; Sohmer Resp. 56.1 ¶ 116; 2007 Will.)

The parties agree that in September of 2015, Sally became angry with Sohmer, (Sohmer 56.1 ¶ 20), however, Targownick contends that Sally became "angry" with Sohmer "long before September 2015," (Targownik Resp. 56.1 ¶ 20), for authorizing her admission into a hospice and then filing a complaint against Targownik with the New York City Department of Adult Protective Services ("APS"), (Sohmer 56.1 ¶ 20; Targownik Resp. 56.1 ¶ 20). Targownik contends that Sohmer was working with an aide, Amanda Mathura, to forcibly admit Sally to the Hospice Inn facility located in Melville, New York, (Targownik Resp. 56.1 ¶ 20), and denies that the APS complaint was against Targownik, (*id*).

### vi. Subsequent will signed on September 17, 2015

On or about September 15, 2015, Targownik began looking for an attorney to write a new will for Sally.[6] (Sohmer 56.1 ¶ 21; Targownik Resp. 56.1 ¶ 21.) Targownik first contacted John Wallenstein, Esq., who referred her to Leonard Offutt, Esq. (Sohmer 56.1 ¶ 22; Targownik Resp. 56.1 ¶ 22.) Thereafter, Targownik contacted Offutt: the parties dispute whether Targownik told Offutt that Sally needed a new will "on an emergency basis." (Sohmer 56.1 ¶ 23; Targownik Resp. 56.1 ¶ 23.) Sohmer contends that Offutt tried communicating with Sally on September 15, 2015, but was unable to do so because Sally was in the hospital. (Sohmer 56.1 ¶

---

[6] Targownik maintains that she was acting on Sally's behalf. (Targownik Resp. 56.1 ¶ 21.)

24.) Targownick contends that Offutt was able to communicate with Sally twice on September

15, 2015. (Targownik Resp. 56.1 ¶ 24.) On September 16, 2015, Offutt contacted Sally via

telephone and, on September 17, 2015, met with Sally at her apartment in Forest Hills, New

York.[7] (Sohmer 56.1 ¶ 25; Targownik Resp. 56.1 ¶ 25.)

On September 17, 2015, Offut presented Sally with a new will, (the "2015 Will), which

she signed in the presence of Andre Feliz, Jr. and Roslyn Holford.[8] (Sohmer 56.1 ¶ 27;

Targownik Resp. 56.1 ¶ 27.) In a deposition held as part of Sally's probate proceedings in the

Surrogate's Court of the State of New York, Queens County, Feliz testified that Sally wanted the

2015 Will to be in the name of Sohmer. (Feliz Dep. 11:4–13, annexed to Sohmer Decl as Ex. 24,

Docket Entry No. 89-25.) Feliz also testified that he was certain he heard Offutt ask Sally if the

2015 Will was to leave everything to Sohmer and that Sally responded "yes." (*Id*. at 15:20–23.)

Holford testified that Targownik told her that Targownik would give her $100,000, although she

was not sure if Targownik was joking.[9] (Holford Dep. 18:1–19, annexed to Sohmer Decl. as Ex.

25, Docket Entry No. 89-26.)

After Sally signed the 2015 Will, Offutt learned that "most of Sally's assets were in the

---

[7] The parties dispute whether Offutt met with Sally "just hours after an APS investigator
met with Sally," (Sohmer 56.1 ¶ 25; Targownik Resp. 56.1 ¶ 25), but agree that the APS
investigator did not know that Offutt was going to be at Sally's apartment with a new will,
(Sohmer 56.1 ¶ 26; Targownik Resp. 56.1 ¶ 26).

[8] Holdford is Sally's home health aide.

[9] Targownik denies the promise of $100,000 as "untrue and a gross mischaracterization
of the record" because Holford "explicitly states that she is not entitled nor is she expecting
anything from this estate." (Targownik Resp. 56.1 ¶ 41.) However, Holford testified at her
deposition that Sally told her she would give her money to purchase a house and a car. (Holford
Dep. 17:1–11.) Holford also testified that when she told Targownik that Sally would give her
money for a house and car, Targownik laughed and told her that Targownik was "only giving
[Holford] a hundred thousand dollars." (Holford Dep. 18:7–10.)

Joint Account. . . and therefore such property would not pass under the [2015] Will he had prepared for Sally." (Sohmer 56.1 ¶ 31; Targownik Resp. 56.1 ¶ 31.) Offutt testified that, in 2015, Sally was under the impression that assets in the Joint Account would pass through her 2015 Will. (Offutt Dep. 78–79.)

After learning that the assets in the Joint Account would not pass through probate, Offutt spoke with Targownik and told her that the 2015 Will would have no effect on the Joint Account. Targownik responded that this was "terrible news" and asked what Offutt could do about that. Offutt responded that he did not know but "would look into it and 'ask around.'" (Sohmer 56.1 ¶ 32; Targownik Resp. 56.1 ¶ 32.)

On September 21, 2015, Targownik sent Offutt several emails asking for advice and help on how to take $150,000 from the Joint Account. (Sohmer 56.1 ¶ 33; Targownik Resp. 56.1 ¶ 33.) Offutt helped Targownik develop a plan "to take as much out of the Joint Account as possible" but believed that Munk would thwart their efforts.[10] (Sohmer 56.1 ¶ 34; Targownik Resp. 56.1 ¶ 34.) Without Sohmer's knowledge and in furtherance of their plan to take $150,000 from the Joint Account, Offutt asked Targownik if she or Sally had Sohmer's social security number. (Sohmer 56.1 ¶ 35; Targownik Resp. 56.1 ¶ 35.)

### vii. Sally's telephone request for withdrawal of $150,000 and Merrill Lynch's filing of an internal report of suspicious activity

On or about September 23, 2015, Sally spoke via telephone with a Merrill Lynch representative and requested $150,000 be sent to her from the Joint Account.[11] (Sohmer 56.1 ¶

---

[10] Targownik denies "the inference that this chronologically followed the emails" sent to Offutt on September 21, 2015, because the record is unclear as to the timing of the events. (Targownik Resp. 56.1 ¶ 34.)

[11] Targownik disputes Sohmer's statement that she was "probably with Sally in Sally's apartment" at the time of this request, (Sohmer 56.1 ¶ 36; Targownik Resp. 56.1 ¶ 36), because

36; Targownik Resp. 56.1 ¶ 36.)  During the telephone conversation, the Merrill Lynch representative heard a voice in the background telling Sally, "tell him," which made the representative suspicious of Sally's request for $150,000.  (Sohmer 56.1 ¶ 37; Targownik Resp. 56.1 ¶ 37.)  Although Targownik does not dispute this statement, she contends that the voice in the background was a male voice.  (Targownik Resp. 56.1 ¶ 37.)  Sohmer contends that the $150,000 was "intended to be transferred to a new, joint checking account that Targownik and Offutt had Sally set up at Apply Bank jointly with Roslyn Holdford as Sally's co-owner." (Sohmer 56.1 ¶ 38; Targownik Resp. 56.1 ¶ 38.)  Targownik disputes that she and Offutt had Sally set up a new checking account at Apple Bank; Targownik contends that she was not present at the bank when the account was established and that Holford and Sally are the persons named on the account.[12]  (Targownik Resp. 56.1 ¶ 38.)  Holford testified that she was added as a co-owner on the account because Targownik could not make it to the bank, but both had planned to substitute Targownik's name for Holford's name.  (Sohmer 56.1 ¶ 39; Targownik Resp. 56.1 ¶ 39.)

As a result of Sally's telephone call to Merrill Lynch in which she requested the $150,000, Merrill Lynch filed an internal report form ("TMRS") on September 23, 2015,

---

the statement is not based on admissible evidence and is instead argumentative, (Targownik Resp. 56.1 ¶ 36).  Targownik also disputes Sohmer's statement that she was "apparently coaching Sally" during her telephone conversation with the Merrill Lynch representative. (Targownik Resp. 56.1 ¶ 36.)

[12] Holford did not use her last name when creating the account and instead used her middle name as her last name.  Thus, the account is under the name "Roslyn Cherylann." (Sohmer 56.1 ¶ 40; Targownik Resp. 56.1 ¶ 40.)

freezing the Joint Account.[13]  (Sohmer 56.1 ¶ 42; Targownik Resp. 56.1 ¶ 42; TRMS Form, annexed to Sohmer Decl. as Ex. 33, Docket Entry No. 90.)  Concerned about potential elder abuse or abuse of an at-risk person because of potential fraud or suspicious activity, Merrill Lynch referred the matter to its Global Financial Crimes Investigation unit for them to determine whether they needed to notify the New York Adult Protective Services.  (Sohmer 56.1 ¶ 43, 46; Targownik Resp. 56.1 ¶ 43, 46; Letter dated June 21, 2017, annexed as Ex. 35 to Sohmer Decl., Docket Entry No. 89-35; TRMS Form 1.)  In addition, internal email communications between Merrill Lynch employees indicate that, ten minutes after Sally's call, Offutt called Merrill Lynch and spoke with Gigi at Merrill Lynch.  (Email dated Sept. 22, 2015, annexed to Sohmer Decl. as Ex. 33, Docket Entry No. 90.)  He told Gigi that he "works with a large amount of elderly clients and [felt that] Sally is [in] a good state of mind and is capable of making good financial decisions for herself."  (*Id*.)  Gigi did not release the funds and was waiting to speak to Sohmer before proceeding with any activity on the Joint Account.  (*Id*.)

### viii.  Efforts to obtain money from the Joint Account after the filing of the TMRS

Several weeks after the Joint Account was frozen, Targownik sought the assistance of Wallenstein in order to obtain money from the Joint Account "through some other means." (Sohmer 56.1 ¶ 48; Targownik Resp. 56.1 ¶ 48.)  Wallenstein declined to help Targownik. (Sohmer 56.1 ¶ 49; Targownik Resp. 56.1 ¶ 49.)  At some time after the Joint Account was frozen, Offutt suggested that Sally and Targownik withdraw $9500 from the Joint Account daily and move the money into the new account at Apple Bank.  (Targownik Dep. 99–101.)

---

[13]  Munk testified that after Merrill Lynch refused to disburse the $150,000, Sally became "snappy" and "very hostile."  (Sohmer 56.1 ¶ 58; Targownik Resp. 56.1 ¶ 35; Munk Dep. 60:8–20.)

The Joint Account remained frozen but, in September of 2015, Merrill Lynch, Sohmer, and Sally agreed that $15,000 per month would be disbursed to Sally. (Sohmer 56.1 ¶ 51; Targownik Resp. 56.1 ¶ 51.)

### ix. Retention of new counsel

In late September of 2015, Offutt "found Christopher Ronan, Esq. of McCoyd Parkas & Ronan LLP to . . . represent Sally." (Sohmer 56.1 ¶ 52; Targownik Resp. 56.1 ¶ 52.) Mr. Ronan first spoke to Sally on September 24, 2015, but he and Sally did not enter into a retainer agreement nor did he receive any payment from Sally. (Ronan Dep. 12–13, annexed to Sohmer Decl. as Ex. 39, Docket Entry No. 89-39.)

On October 19, 2015, Ronan and Munk had a telephone conversation in which Munk told Ronan that Sally was susceptible to influence, "fired excellent aids," and then made a request for $150,000 "out of the blue." (Sohmer 56.1 ¶ 63; Targownik Resp. 56.1 ¶ 63.)

### x. Sally's admission to the hospital and subsequent seizure

On December 6, 2015, Sally was admitted to North Shore Long Island Jewish Forest Hills Hospital after experiencing shortness of breath for three days. (Report of Ilene Zwirn, M.D.[14] ("Zwirn Report") 3, annexed to Sohmer Decl. as Ex. 48, Docket Entry No. 89-48.) She was diagnosed with "pneumonia superimposed upon chronic lung disease and a possible urinary tract infection." (Sohmer 56.1 ¶ 71; Targownik Resp. 56.1 ¶ 71; Zwirn Report 3.) On December 12, 2015, Sally had a seizure and was found alive but unresponsive in her hospital room. (Sohmer 56.1 ¶ 72; Zwirn Report 3.) Zwirn states in her report that it is unclear what caused the seizure but the seizure "is an indication of abnormal electrical activity in the brain." (Sohmer

---

[14] Dr. Zwirn is a consulting forensic psychiatrist.

56.1 ¶ 72; Zwirn Report 3.)

### xi. Documents and codicil to the 2015 Will signed by Sally while hospitalized

On December 17, 2015, hospital personnel told Targownik that Sally's health was "failing rapidly." (Sohmer 56.1 ¶ 78; Targownik Resp. 56.1 ¶ 78.) The parties dispute whether the hospital told Targownik that Sally would not live much longer, (Sohmer 56.1 ¶ 78), or whether she was told that Sally was "unlikely to come out of the hospital," (Targownik Resp. 56.1 ¶ 78). Sohmer contends that at about 3:20 PM on December 17, 2015, Targownik called Ronan, told him that Sally did not have much longer to live ,was not going to be discharged from the hospital, and requested that he immediately visit Sally at the hospital.[15] (Sohmer 56.1 ¶ 79; Telephone Message dated December 17, 2015, annexed to Sohmer Decl. as Ex. 49, Docket Entry No. 89-49.)

Ronan arrived at the hospital later that day. (Sohmer 56.1 ¶ 82; Targownik Resp. 56.1 ¶ 82.) At Sally's bedside, Ronan handwrote two letters addressed to Merrill Lynch and asked Sally to sign the letters. (Sohmer 56.1 ¶ 83; Targownik Resp. 56.1 ¶ 83.) One letter requested that Merrill Lynch revoke the Joint Account and transfer all assets to a new account solely in Sally's name, and the other letter requested that Merrill Lynch revoke half of the Joint Account and transfer half of all assets into a new account solely in Sally's name. (Sohmer 56.1 ¶ 83; Targownik Resp. 56.1 ¶ 83; Letters dated December 17, 2015, annexed to Sohmer Decl. as Ex. 53, Docket Entry No. 89-53.)

In addition, Ronan handwrote a codicil to Sally's 2015 Will, requesting that Merrill Lynch revoke the Joint Account and forgive "loans" to Targownik. (Sohmer 56.1 ¶ 84;

---

[15] Targownik objects on the basis that these "facts . . . are not supported by admissible evidence." (Targownik Resp. 56.1 ¶ 79.)

Targownik Resp. 56.1 ¶ 84; Codicil to the 2015 Will, annexed to Sohmer Decl. as Ex. 53, Docket Entry No. 89-53.)

Sally signed the letters and the codicil in the presence of Ronan and Holford, who acted as witnesses for all three documents.  (Sohmer 56.1 ¶¶ 85–86; Targownik Resp. 56.1 ¶¶ 85–86.)

Medical progress notes from December 17, 2015, the date Ronan handwrote and gave Sally certain letters to sign, indicate that, the prior night, Sally experienced respiratory distress, was more lethargic and was moaning, and was not fully oriented.  (Sohmer 56.1 ¶ 76; Zwirn Report 3.)  Zwirn states in her report that Sally was "vulnerable to undue influence" during her hospitalization, including on December 17, 2015.[16]  (Sohmer 56.1 ¶ 77; Zwirn Report 3–4.)

On December 18, 2015, Ronan mailed both letters to Munk at Merrill Lynch and stated that Merrill Lynch could not refuse Sally's "direction that the joint tenancy be severed," despite any rights Sohmer may have.  (Letter addressed to Munk dated Dec. 18, 2015, annexed to Sohmer Decl. as Ex. 57, Docket Entry No. 89-57.)

### xii.   CT scan of Sally's brain and her death

On December 21, 2015, the hospital performed a computerized tomography (CT) scan on Sally's brain; it showed extensive chronic white matter micro-vascular disease.  (Sohmer 56.1 ¶ 73; Zwirn Report 3.)  Zwirn states in her report that, according to a hospital psychiatry consultant's note dated December 16, 2015, Sally had the capacity to make decisions regarding her treatment and hospice care, was noted to be anxious, irritable and defensive, and to have mild cognitive impairment, and Sally's insight and judgment at the time were fair.  (Sohmer 56.1 ¶ 74; Zwirn Report 3.)

---

[16]  Targownik disputes all statements based on Dr. Zwirn's report on the basis that "the facts stated . . . are unsupported by admissible evidence."  (Targownik Resp. 56.1 ¶¶ 70–77.)

Sally passed away on January 4, 2016. (Certificate of Death, annexed to Calcagni Decl. as Ex. 14, Docket Entry No. 91-17.)

### xiii. Ronan's representation

On January 14, 2016, ten days after Sally passed away, Ronan sent Targownik a retainer agreement, which she signed on January 18, 2016. (Sohmer 56.1 ¶ 54; Targownik Resp. 56.1 ¶ 54; Retainer Agreement, annexed to Sohmer Decl. as Ex. 40, Docket Entry No. 89-40.)

On July 18, 2016, Ronan sent Targownik a bill for legal services rendered in connection with Sally's estate planning. (Sohmer 56.1 ¶ 55; Targownik Resp. 56.1 ¶ 55; Billing Letter dated July 18, 2016, annexed to Sohmer Decl. as Ex. 41, Docket Entry No. 89-40.)

On December 19, 2016, Targowni, in her capacity as preliminary executor of Sally's estate, owed Ronan and his law firm $64,000 in legal fees.[17] (Sohmer 56.1 ¶ 56; Targownik Resp. 56.1 ¶ 56.)

### xiv. Merrill Lynch's subsequent communications with the parties

By email dated January 17, 2016, Merrill Lynch informed Sohmer that the Joint Account would be moved to an account in his name on January 18, 2016. (Sohmer 56.1 ¶ 91; Targownik Resp. 56.1 ¶ 91; Email dated Jan. 27, 2016, annexed to Sohmer Decl. as Ex. 58, Docket Entry No. 89-58.)

On February 4, 2016, Merrill Lynch wrote to both Sohmer's attorney and Ronan, as representative of Sally's estate, to inform them that unless Targownik obtained an injunction against a transfer of all assets to Sohmer from a court of competent jurisdiction, or posted an indemnity bond in an amount sufficient for Merrill Lynch, Merrill Lynch would transfer the Joint

---

[17] Targownik and Sohmer dispute whether Sohmer's power of attorney was revoked by the power of attorney given to Targownik. (Sohmer 56.1 ¶ 60; Targownik Resp. 56.1 ¶ 60.)

Account to Sohmer in fifteen days.  (Sohmer 56.1 ¶ 94; Targownik Resp. 56.1 ¶ 94; Letter dated Feb. 4, 2016, annexed to Sohmer Decl. as Ex. 59, Docket Entry No. 89-59.)

On April 15, 2016, Merrill Lynch filed this interpleader action to determine proper ownership and distribution of the Joint Account funds.  (Sohmer 56.1 ¶ 96; Targownik Resp. 56.1 ¶ 96.)

## II. Discussion

### a. Standard of review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018); *see also Cortes v. MTA NYC Transit*, 802 F.3d 226, 230 (2d Cir. 2015).  The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists."  *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)).  A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.  The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment.  *Id.*  The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the nonmoving party, a rational juror could find in favor of that party."  *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### b. Presumption of joint tenancy with right of survivorship

Targownik argues that there is sufficient evidence to rebut the presumption that a joint

tenancy with right of survivorship was intended with regard to the Joint Account because Sally created the Joint Account as a matter of convenience and did not intend to convey a present beneficial interest or gift to Sohmer. (Targownik Mem. 10.) She argues that the Court should therefore deny Sohmer's motion for summary judgment and grant her summary judgment as a matter of law. (*Id*.) Targownik further argues that because the Joint Account was for convenience, Sally had the right to alienate all funds in the Joint Account. (*Id*. at 20.)

Sohmer argues that he is entitled to summary judgment because the Joint Account is a valid joint tenancy with right of survivorship and that Targownik fails to show by clear and convincing evidence that the Joint Account was created as a matter of convenience. (Sohmer Mem. 6.)

Section 675(a) of the New York Banking Law provides that when a deposit of cash is made in the name of the depositor and another person, the deposit "shall become the property of such persons as joint tenants and may be paid or delivered to either during the lifetime of both or to the survivor after the death of one of them." *In re Estate of Stalter*, 703 N.Y.S.2d 600, 601–02 (App. Div. 2000) (alterations omitted) (quoting N.Y. Banking Law § 675(a))); *see New York Community Bank v. Bank of America*, --- N.Y.S.3d ---, 169 A.D.3d 35, 38 (App. Div. 2019) ("When two or more persons open a bank account, making a deposit of cash, securities, or other property, a presumption of joint tenancy with right of survivorship arises." (citing N.Y. Banking Law § 675(b))). Courts have interpreted "bank account" to include joint brokerage and investment accounts. *See In re Estate of Corcoran*, 877 N.Y.S.2d 522, 524–25 (App. Div. 2009) (finding that the section 675(b) presumption applies to joint brokerage and investment accounts); *Fehring v. Fehring*, 874 N.Y.S.2d 266, 268 (App. Div. 2009) (finding that application of the presumption is not altered by "the fact that the deposit is not made into a traditional banking

account, but instead into a joint brokerage or investment account"); *In re Magacs*, 642 N.Y.S.2d 361, 363 (App. Div. 1996) (finding that the "signature card adding [the] respondent's name to the" bank account contained "the requisite survivorship language to bring that account within the ambit of" the presumption).

"In order for the statutory presumption to be triggered, however, the 'survivorship' language must appear on the signature card for the subject account." *Stalter*, 703 N.Y.S.2d at 602 (collecting cases). If such language is present, "the burden then shifts to the party challenging the title of the survivor" who must either "establish fraud, undue influence or lack of capacity" or offer "direct proof or substantial circumstantial proof, clear and convincing and sufficient to support an inference that the joint account had been opened in that form as a matter of convenience only."[18] *Id.* (collecting cases).

"The statutory presumption of joint ownership . . . may be rebutted by showing that the true situation as to ownership is different and that the account was established in joint names solely as a matter of convenience, not with the intention of conferring any beneficial property interest on the other individual." *New York Community Bank*, --- N.Y.S.3d ---, 169 A.D.3d at 38; *see also In re Grodetzky*, 495 B.R. 223, 226 (E.D.N.Y. 2012) ("The presumption created by Banking Law [section] 675 can be rebutted by providing direct proof that no joint tenancy was intended or substantial circumstantial proof that the joint account had been opened for convenience only." (quoting *Signature Bank v. HSBC Bank*, 889 N.Y.S.2d 242, 242 (2d Dept. 2009))); *In re Carella*, 340 B.R. 710, 712 (W.D.N.Y. 2006) ("[T]he key issue is whether a party truly intends to transfer ownership, or merely seeks a short-hand method to accomplish some

---

[18] It is undisputed that Sally and Sohmer are named owners of the Joint Account and that the Joint Account includes the language necessary to trigger the Banking Law's presumption.

other legitimate purpose.").

The burden is on the "party challenging the survivorship rights 'to establish — by clear and convincing evidence — fraud, undue influence, lack of capacity or, . . . that the account[][was] only opened as a matter of convenience and [was] never intended to be [a] joint account." *In re Estate of Farrar*, 12 N.Y.S.3d 312, 315 (App. Div. 2015) (alterations in original) (citing *In re Estate of Grancaric*, 936 N.Y.S.2d 723, 726 (App. Div. 2012)). "Mere conclusory assertions are insufficient to rebut the presumption." *Grodetzky*, 495 B.R. at 227.

Courts consider several factors in deciding whether a joint account was established as a matter of convenience. "A major factor . . . is the conduct and statements of a surviving [co-tenant]." *In re Estate of Corcoran*, 877 N.Y.S.2d at 525. In examining the conduct and statements of a surviving co-tenant, courts consider whether one party was in sole possession of the joint account's checkbook, whether the surviving co-tenant received account statements, and whether the surviving co-tenant withdrew or deposited any funds. *See Grodetzky*, 496 B.R. at 227 (noting that courts have considered who possesses the account checkbook in deciding whether the account was created for convenience); *Harrington v. Brunson*, 12 N.Y.S.3d 696, 698 (App. Div. 2015) (finding that defendant sufficiently rebutted the presumption of joint tenancy by "submitt[ing] evidence establishing, *inter alia*, that [the] decedent was the sole depositor of the joint accounts, and that [the] plaintiff never withdrew funds from the joint accounts during [the] decedent's lifetime"); *Pinasco v. Ara*, 631 N.Y.S.2d 346, 347 (App. Div. 1995) (finding that the plaintiff presented sufficient facts to rebut the presumption of joint tenancy where, *inter alia*, the plaintiff exclusively possessed the checkbook); *In re Estate of Boyd*, 588 N.Y.S.2d 188, 188–89 (App. Div. 1992) (considering the source of the funds and whether the surviving co-tenant made any deposits in deciding whether the plaintiff rebutted the presumption of joint

tenancy); *Wacikowski v. Wacikowski*, 461 N.Y.S.2d 888, 889 (App. Div. 1983) (noting that one factor resulting in rebuttal of presumption was that one party "always had exclusive possession of the account passbook"); *but see S.M.R.C., Inc. v. Watkins*, No. 13-CV-193, 2015 WL 5774777, at *5–6 (E.D.N.Y. May 4, 2015) (finding that the plaintiff failed to rebut the presumption where only one co-tenant deposited the funds into the account and the other co-tenant failed to notify the Internal Revenue Service about her possessory right); *In re Ricci*, 795 N.Y.S.2d 672, 673 (App. Div. 2005) ("There is no rule that the presumption is automatically rebutted where the depositor, here the decedent, had exclusive possession of the passbooks, the survivor made no deposits or withdrawals during his lifetime, and the sole source of the funds was the decedent.").

Courts have also considered whether the joint account was established in anticipation of illness or disability. *See Carella*, 340 B.R. at 712 (finding that the plaintiff overcame the presumption of joint ownership where "the [other co-tenant] represented that he feared death as a consequence of his cardiac surgery, and that a purpose for changing the account was to assure an orderly transfer of assets upon death"); *Fregetti v. Fregetti*, 692 N.Y.S.2d 442, 443 (App. Div. 1999) (finding that the joint account was for convenience only where the "parents of [one co-tenant] were the sole source of the funds in the joint account, the interest earned on the account was reported under the parents' Social Security numbers . . . , the [co-tenant's] name was added to the account as a convenience in the event of the parents' illness or disability, and the defendant made no deposits or withdrawals on her own behalf").

In addition, courts have considered whether "creation of a joint tenancy with the right of survivorship in the joint accounts 'would represent a substantial deviation from [the decedent's] previously expressed testamentary plan.'" *Harrington*, 12 N.Y.S.3d at 698 (quoting *In re Yaros*,

935 N.Y.S.2d 627, 629 (App. Div. 2011)); *Yaros*, 935 N.Y.S.2d at 629 (finding that the petitioner submitted sufficient evidence to rebut the Banking Law presumption in part because the creation of a joint account would represent a substantial deviation from the decedent's previously expressed testamentary plan); *Celentano v. Pantangelo*, 977 N.Y.S.2d 666 (Sur. Ct. 2013) (considering the testamentary scheme of the decedent in deciding whether the joint account was established as a matter of convenience).

Prior to 2004, the Joint Account was a Merrill Lynch account under Sally's name. (Targownik 56.1 ¶ 97; Sohmer Resp. 56.1 ¶ 97.)[19]  In July of 2004, Sally instructed Munk "to create a joint tenancy structure for the stock ownership."  (Munk Dep. 45:11–14.)  Munk "suggested" to Sally that she put someone else's name on the account so that the account would not "have to go through probate and all the other nonsense."  (*Id*. at 45:21–24.)  Sally agreed and instructed Munk to add the name of her brother, Sohmer, to the Joint Account.  (*Id*. at 45:24.) Sohmer does not recall making any deposits into or contributions to the Joint Account, did not execute any trades on the account, and Gigi testified that she did not recall Sohmer making any deposits into the Joint Account.  (Targownik 56.1 ¶¶ 106–08; Sohmer Resp. 56.1 ¶¶ 106–08; Sohmer Dep. 174:17–23; Gigi Dep. 384:8–10.)  This evidence is insufficient to rebut the

---

[19]  Targownik inappropriately relies on her attorney's declaration to attempt to create disputed issues of fact.  Although "an attorney's affidavit can be used, in connection with a summary judgment motion, to place documents produced in discovery before the [c]ourt," *Pace v. Air & Liquid Systems Corporation*, 171 F. Supp. 3d 254, 272 (S.D.N.Y. 2016) (internal quotation omitted), an attorney's declaration containing factual allegations not based on personal knowledge does not carry any weight, *see Smeraldo v. City of Jamestown*, 512 F. App'x 32, 34 (2d Cir. 2013) (finding that a court may decline to consider aspects of an attorney's affidavit not based on personal knowledge); *Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (holding that inadmissible statements in affidavits submitted in support of summary judgment motion are incapable of raising material issues of fact).  Counsel's declaration contains factual allegations for which he has no personal knowledge.  The Court therefore considers only those sections of his declaration that introduce attached exhibits.

Banking Law's presumption that the account belonged jointly to Sally and Sohmer because Sohmer still had the authority to write checks and make payments from the Joint Account. *See, e.g.*, *Grodetzky*, 495 B.R. at 227 (finding that presumption of joint ownership not rebutted where "the use of the accounts was not so limited" so as to demonstrate they were opened merely as a matter of convenience); *Kay v. Kay*, 754 N.Y.S.2d 766, 769 (App. Div. 2003) (finding an account jointly owned where party "had authority to give orders and execute trades").

However, the facts of this case also satisfy some of the other factors that have contributed to a finding that the Banking Law presumption has been rebutted, including whether the account is created in anticipation of illness or disability, whether one co-tenant paid taxes on the account, contributed all funds to the account, and received all account statements.

Sohmer testified that Sally named him on the Joint Account "to help her in case she became incapacitated" and "to avoid probate."[20] (Sohmer Dep. 33:17–24.) In addition, in support of her argument that the Joint Account was established as a matter of convenience, Targownik relies on Sohmer's testimony that he cannot confirm or deny that he paid income taxes on the Joint Account but that he believes Sally paid the taxes "because of her lower tax rate." (Targownik 56.1 ¶¶ 111–12; Sohmer Resp. 56.1 ¶¶ 111–12.); *see Fischedick v. Heitmann*, 699 N.Y.S.2d 508, 509 (App. Div. 1999) (finding evidence that the "parties paid taxes only on the accounts bearing their own name first" coupled with evidence that the plaintiff never withdrew nor deposited funds into the joint accounts sufficient to rebut the Banking Law presumption).

---

[20] Munk testified that Sally was also aware of the fact that a Joint Account would give Sohmer access to the account, but that Munk did not believe that Sally intended to give Sohmer a gift at the time and believes Sally anticipated having full control over the account. (Munk Dep. 178–79.)

Further, the parties do not dispute that the "Joint Account consisted of securities which had been Sally's alone prior to" July of 2004. (Targownik 56.1 ¶ 102; Sohmer Resp. 56.1 ¶ 102.) Although Sohmer contends that he had been named Sally's power of attorney since November 4, 1994, (Sohmer Resp. 56.1 ¶ 102), this fact is of no consequence as the power of attorney authorized him to conduct banking transactions on behalf of and for the benefit of Sally, and therefore does not negate the fact that the securities in the Joint Account belonged to Sally.

The parties dispute whether Sohmer possessed a checkbook for the Joint Account and whether Sohmer received Joint Account statements. Sohmer states in his declaration that from the time the Joint Account was established, he had in his possession "blank checks" that allowed him to withdraw funds from the Joint Account. (Sohmer Decl. ¶ 22.) Targownik's counsel states that he is "in possession of the Merrill Lynch account checkbook provided to me my [sic] client who cleaned out Sally's apartment" and that the "record is devoid of evidence that [Sohmer] possessed a checkbook." (Calcagni Decl. ¶ 149.) Further, Munk testified that he believed Sally was the only person to receive statements in connection with the account. (Munk Dep. 47:15–23.) However, Sohmer's sworn statement states that he received Joint Account statements.[21] (Sohmer Decl. ¶ 20.) These conflicting statements create a factual dispute relevant to the determination of whether Sally named Sohmer on the account as a matter of convenience.

In addition, Targownik argues that "the creation of a survivorship interest in the [Joint Account] would essentially eviscerate Sally's testamentary plan . . . as evidenced by [her] 1994

---

[21] Sohmer also attaches a Joint Account statement for February of 2014 sent to an address in Forest Hills, New York. (Joint Account Statement, annexed to Sohmer Decl. as Ex. 11, Docket Entry No. 89-12.) In response to Sohmer's Request for Admissions, Merrill Lynch states that "duplicate copies of account statements for the [Joint] Account . . . were automatically sent to Seymour Sohmer beginning on March 26, 2015." (Pl. Resp. and Obj.to Sohmer's Request for Admissions 4, annexed to Targownik Reply Decl. as Ex. 2., Docket Entry No. 91-35.)

Will and her slightly revised 2007 Will, which was created three years after Sally added [Sohmer's] name to the [Joint Account]."  (Targownik Reply 4, Docket Entry No. 92.)

Sally's 2007 Will includes a cash bequest to Sohmer in the amount of $10,000 as well as gifts for the education expenses of her three grandnephews.  (2007 Will 3 ("The amount of the contribution for the benefit of each grandnephew shall be equal to . . . ($20,000.00) for each full year of college that such grandnephew has remaining.").)  The 1994 Will made similar substantial gifts to Sally's grandnephews to cover their education expenses.  (1994 Will 2–3.)  Targownik argues that it is undisputed that the Joint Account "was essentially Sally's entire estate."  (Reply 3.)  Sohmer disagrees that Sally's gifts to her grandnephews "could have only been funded if [the Joint Account], her only substantial asset, passed through the estate."  (Sohmer Resp. 56.1 ¶ 116.)  Because courts consider the decedent's testamentary scheme in deciding whether a joint account was established as a matter of convenience, this dispute is relevant and material.  *Corcoran*, 877 N.Y.S.2d at 525 (finding that, because the decedent's will, executed three months after the joint account was opened, left all of her estate to the petitioner and respondent equally, and since the joint account constituted more than one-half of the decedent's estate, "decedent's testamentary disposition is arguably inconsistent with an intent to give [the] respondent alone rights of survivorship").

It is undisputed that Sally opened the Joint Account "in case she became incapacitated" and to "avoid probate as well," (Sohmer Dep. 33:17–24; Targownik 56.1 ¶ 99), that Sally was the sole depositor of the funds in the Joint Account, that Sohmer never withdrew funds from the Joint Account, and that Sally paid taxes on the Joint Account.  At least one court has found these undisputed facts sufficient to rebut the Banking Law presumption.  *See Harrington*, 12 N.Y.S.3d at 698 (finding evidence that the decedent was the sole depositor of the joint accounts, and that

plaintiff never withdrew funds from the joint accounts during decedent's lifetime, sufficient to raise a triable issue of fact whether, at the time the accounts were created, the accounts were opened as a matter of convenience). Nevertheless, there are disputed issues of fact that are relevant to determining whether Targownik has provided substantial circumstantial evidence to rebut the Banking Law presumption and raise a triable issue of fact as to whether the Joint Account was established as a matter of convenience and therefore passes through Sally's estate. Accordingly, the Court denies the parties' cross motions for summary judgment.[22]

### c. Doctrine of unclean hands

Sohmer argues that the doctrine of unclean hands bars Targownik from any relief from this Court. (Sohmer Reply 9.)

Targownik argues that Sally signed the letters of instruction without any undue influence, lack of capacity, or fraud, and that Sally's estate is entitled to at least her one-half moiety interest in the Joint Account. (Targownik Reply 8–9.)

It is well established that "he who comes into equity must come with clean hands." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). The doctrine of "unclean hands" is premised on the maxim that a party "who has acted fraudulently, or who by deceit or any unfair means has gained an advantage" is not entitled to obtain equitable relief." *PenneCom B.V. v. Merrill Lynch & Co.*, 372 F.3d 488, 493 (2d Cir. 2004); *Genger*, 76 F. Supp. 3d at 502 ("The doctrine of unclean hands applies when the complaining party shows that the offending party is guilty of immoral, unconscionable conduct and even then only when the

---

[22] Because the Court finds that a reasonable factfinder could determine that the Joint Account passes through Sally's estate, the Court declines to address Targownik's alternative argument that Sally's estate is entitled to at least one-half of the Joint Account Funds because letters of instruction were delivered to Merrill Lynch severing the Joint Account. (Targownik Mem. 2.). Targownik may reassert this argument at trial, if necessary.

conduct relied on is directly related to the subject matter in litigation and the party seeking to invoke the doctrine was injured by such conduct.'" (quoting *Kopsidas v. Krokos*, 742 N.Y.S.2d 342, 344 (2002))); *see also Nat'l Distillers & Chem. Corp. v. Seyopp Corp.*, 17 N.Y.2d 12, 15–16 (1966) ("[The unclean hands doctrine] is never used unless the plaintiff is guilty of immoral, unconscionable conduct and even then only when the conduct relied on is directly related to the subject matter in litigation and the party seeking to invoke the doctrine was injured by such conduct." (internal quotation marks omitted)).

Sohmer argues that Targownik engaged in various efforts to steal Sally's property and defraud Sohmer and Merrill Lynch.  (Sohmer Reply 10.)  None of Targownik's conduct bares directly on the question of whether the Joint Account was established as a matter of convenience. Rather, Targownik's alleged fraudulent conduct relates to events leading up to Sally's death, Sally's unsuccessful attempt to withdraw $150,000 from the Joint Account, and the two letters of instruction sent by Ronan to Merrill Lynch.

Even assuming Targownik's conduct relates directly to the subject matter at issue, Targownik sharply disputes Sohmer's characterization of events leading up to Sally's death. (*See generally* Targownik Resp. 56.1.)  For example, Sohmer argues that based on the evidence, Sally was subject to undue influence and Targownik engaged in conduct to deprive Sally of her money, (Sohmer 56.1 ¶¶ 77, 78–87),  Targownik states under oath that Sally was upset with Sohmer because he "forcibly admitted" her to an inpatient hospice, that Sohmer was worried Sally would block his access to her money, and that Sally's mental capacity was not vulnerable to undue influence, (Targownik Reply Decl., 15-16, 21).  In view of the sharply disputed issues of material fact, the Court cannot determine as a matter of law that the doctrine of unclean hands bars Targownik's request for relief as executor of Sally's estate.  The role of the court "is not

to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz*, 796 F.3d at245 (first quoting *Kaytor*, 609 F.3d at 545; and then citing *Anderson*, 477 U.S. at 249–50).

## III. Conclusion

For the foregoing reasons, the Court denies the parties' cross motions for summary judgment.

Dated: March 29, 2019
      Brooklyn, New York

SO ORDERED:


_____ s/ MKB _____
MARGO K. BRODIE
United States District Judge
